# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| WILTER OBONDI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:15-CV-2022-B |
| | § | |
| UT SOUTHWESTERN MEDICAL | § | |
| CENTER, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant UT Southwestern Medical Center's (UT Southwestern)
Motion for Summary Judgment. Doc. 26. For the following reasons, the Court **GRANTS** UT
Southwestern's Motion.

## I.

## BACKGROUND[1]

This is an employment discrimination case. Plaintiff Wilter Obondi (Obondi) is a Registered
Cardiovascular Invasive Specialist (RCIS) and works for UT Southwestern as a Cardiac Cath Lab
IR Lab Technologist (*i.e.*, a lab tech) in Interventional Cardiology. Doc. 1, Compl. ¶¶ 18, 22; Doc.
27, Def.'s Br. Supp. Def.'s Mot. Summ. J. 1 [hereinafter Def.'s Br.]; *see also* Doc. 16, Mem. Op. &
Order 1 n.1. She has worked there in that capacity since May 2006. Doc. 1, Compl. ¶ 18; Doc. 27,
Def.'s Br. 1.

---

[1]The Court draws its factual account from the allegations contained in Plaintiff Wilter Obondi's
Original Complaint (Doc. 1) and UT Southwestern's summary judgment briefing. Any contested fact is
identified as the allegation of a particular party.

In 2009, Nikki Rupe (Rupe) began managing the unit in which Obondi worked. Doc. 1, Compl. ¶¶ 19–21; Doc. 27, Def.'s Br. 1. In her Original Complaint, Obondi alleges that Rupe mistreated her because Obondi's national origin is Kenyan. *Id.* Examples of Rupe's alleged misconduct include: (1) "demoting [Obondi] from a team leader position to a regular technologist [position]"[2] on or about October 10, 2012;[3] (2) routinely assigning Obondi tasks that "she is not qualified to perform and which should have been assigned to different technologists"; (3) "routinely talking in a harsh, hostile manner towards [Obondi] that she does not use towards other employees in the Unit";[4] (4) "giving [Obondi] lower raises than her non-Kenyan counterparts"; (5) "not paying [Obondi] the same as she pays [Obondi's] non-Kenyan counterparts";[5] and (6) continuously making demeaning remarks, ridiculing statements, negative comments, and negative innuendos towards Obondi. Doc. 1, Compl. ¶ 23.

To remedy this alleged discrimination, Obondi says that she first complained to Rupe; then in September 2013, to Rupe's supervisors and human resources (HR); and finally, two months later, to the Employee Assistance Program (EAP). *Id.* ¶¶ 27–28, 31.[6] All to no avail—Obondi maintains

---

[2]Generally, a team leader position is not a separate role altogether; rather, a team leader works as a member of a team but also performs additional leadership duties. At UT Southwestern, it appears that team leaders receive additional compensation for performing these additional duties. Doc. 1, Compl. ¶ 23 ("[D]emoting Plaintiff from a team leader position to a regular technologist . . . resulted in a corresponding reduction in pay.").

[3]This date comes from UT Southwestern's summary judgment briefing. Doc. 27, Def.'s Br. 3. The Court did not find it in any of Obondi's papers.

[4]Obondi is one of 11 lab techs in the unit; she is the only Kenyan lab tech. Doc. 1, Compl. ¶ 22.

[5]Obondi alleges that she "is the lowest paid RCIS with the largest amount of employment responsibilities." Doc. 1, Compl. ¶ 55.

[6]Though unclear from the Complaint, EAP is more or less an HR program. *See, e.g.*, *Henson v. Bell Helicopter Textron*, No. 4:01-cv-1024-Y, 2004 WL 238063, at *2 (N.D. Tex. Feb. 6, 2004); *Hudson v. Mobil*

that UT Southwestern took no action to address her grievances, but rather suggested that she change jobs. Doc. 1, Compl. ¶¶ 27–28, 31.

Obondi alleges that UT Southwestern retaliated against her after she complained. *Id.* ¶ 32. In particular, Obondi says that UT Southwestern: (1) failed to provide equal pay for her; (2) changed her work conditions; (3) assigned her more work than she could complete within one work day; (4) micro-managed her; (5) applied written policies to her in a discriminatory manner; and (6) failed to remedy known harassment issues. *Id.* ¶ 33.[7] Obondi further claims that she received a written reprimand in retaliation on or about November 26, 2013. *Id.* ¶¶ 34–35.

In response, Obondi filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC) in February 2014. *Id.* ¶ 36. In March 2015, she received a Notice of Rights Letter from the EEOC. *Id.* ¶ 37. Within 90 days, she filed her Complaint in this case alleging the following violations of federal and state law:

- National origin discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.*;

- Pay disparity under: Title VII; the Lilly Ledbetter Fair Pay Act of 2009 and its counterpart 42 U.S.C. § 1981 (Section 1981); and the Equal Pay Act of 1963 (Equal Pay Act), 29 U.S.C. § 206;

- Disparate treatment under Title VII and Section 1981;

- Disparate impact under Title VII;

- Hostile work environment under Title VII and the Texas Commission on Human Rights Act (TCHRA), Tex. Labor Code §§ 21.001 *et seq.*;

---

*Oil Corp.*, No. 399cv2793L, 2002 WL 373564, at *1 (N.D. Tex. Mar. 6, 2002). So a complaint to EAP is essentially an HR complaint.

[7]EdObondi's Complaint also lists her examples of discrimination as examples of retaliation. *Compare* Doc. 1, Compl. ¶ 23, *with id.* ¶ 33.

- Mental abuse under Texas law; and

- Retaliation Under Title VII, the Equal Pay Act; and the TCHRA.

Doc. 1, Compl. ¶¶ 41–48, 49–56, 57–63, 64–70, 71–84, 85–110, 111–19. UT Southwestern then

moved to dismiss all of Obondi's claims under Federal Rules of Civil Procedure 12(b)(1) and (b)(6).

Doc. 5, Def.'s Mot. Dismiss. In response, Obondi voluntarily dismissed her Section 1981, TCHRA,

disparate impact, and mental abuse claims. *See* Doc. 16, Mem. Op. & Order 4, 13. The Court further

dismissed Obondi's Equal Pay Act Claims. *Id.* at 16.

Thus, only Obondi's Title VII claims for national origin discrimination,[8] pay disparity,[9] hostile

---

[8]As referenced above, Obondi's Complaint asserts claims for both national origin discrimination and disparate treatment under Title VII. But those claims are one in the same.

> Under [Title VII], suit may be brought under two distinct theories of discrimination, disparate treatment and disparate impact. Title VII expressly prohibits both (1) intentional discrimination based on race, color, religion, sex or national origin, known as "disparate treatment," as well as (2) an employer's facially neutral practices that are discriminatory in operation against protected groups (race, color, religion, sex or national origin) and not required by the nature of the job, known as "disparate impact."

*Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 731–32 (S.D. Tex. 2014) (internal citations omitted). Said differently, "national origin discrimination" is not in and of itself a cause of action; rather, it is a form of discrimination for which a plaintiff may recover under one of two theories: disparate treatment and disparate impact. *See id.*

Obondi dropped her disparate impact claim, so she must proceed under the disparate treatment theory. *See id.*; Doc. 16, Mem. Op. & Order 4, 13. Thus, her claims for national origin discrimination and disparate treatment are redundant—indeed, they rest on the same factual assertions. *See* Doc. 1, Compl. ¶ 62 (alleging in support of her disparate treatment claim only that "Defendant took adverse employment actions against Plaintiff as outlined above"). What's more, both claims share the same elements. *Compare Harry v. Dall. Hous. Auth.*, No. 3:14-cv-0482-M, 2016 WL 67769, at *6 (N.D. Tex. Jan. 5, 2016) ("To establish a prima facie case of [national origin] discrimination, [plaintiff] must show that he (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of his protected class, or that other similarly situated individuals were treated more favorably."), *with Hernandez v. Dall. Ind. Sch. Dist.*, No. 3:14-cv-0022-BK, 2014 WL 7231929, at *3 (N.D. Tex. Dec. 17, 2014) ("To establish a claim of disparate treatment resulting in unlawful termination from employment, a plaintiff must show that (1) he belongs to a protected class; (2) he was qualified to do his job; (3) despite his qualification, his employment situation was adversely affected; and (4) his position was filled by someone outside the protected class."). As a result, the Court construes them together as a claim for

work environment, and retaliation remain. UT Southwestern moved to dismiss all of those claims in its Motion for Summary Judgment. Obondi did not respond to UT Southwestern's Motion. It is therefore ripe for the Court's review.

## II.

## LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate

---

disparate treatment on the basis of national origin. *See Agoh*, 992 F. Supp. 2d at 731–32.

[9]The Court notes that Obondi's Complaint purports to assert a standalone pay disparity claim under the Lilly Ledbetter Fair Pay Act of 2009. Doc. 1, Compl. ¶¶ 49–56. That Act, however, "does not provide a separate cause of action." *Boyar v. City of N.Y.*, No. 10 CV 65(HB), 2010 WL 4345737, at *5 (S.D.N.Y. Oct. 28, 2010); *see also Dixon v. Univ. of Toledo*, 638 F. Supp. 2d 847, 850–51 (N.D. Ohio 2009) (rejecting claim because the Lilly Ledbetter Fair Pay Act "does not create a new cause of action"). Rather, it "provides that the statute of limitations on Title VII claims based on unequal compensation begins to run anew following each receipt of unequal pay." *Boyar*, 2010 WL 4345737, at *5. For that reason, the Court considers Obondi's Lilly Ledbetter Act claim as one with her Title VII claim for pay disparity. *See Moore v. Shands Jacksonville Med. Ctr., Inc.*, No. 3:09-cv-298-J-34TEM, 2013 WL 12178163, at *3 n.9 (M.D. Fla. Oct. 18, 2013).

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). But if the non-movant ultimately bears the burden of proof at trial, the movant may satisfy its burden just by pointing to the absence of evidence supporting the non-movant's case. *Id.* at 322–23.

If the movant meets that burden, then it falls to the non-movant to "show with significant probative evidence that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (internal quotation marks omitted) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). And significant probative evidence is just that: significant. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam). "[M]etaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not do. *Id.* (internal citations and quotation marks omitted). Rather, "the non-movant must go beyond the pleadings and present specific facts indicating a genuine issue for trial." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (citing *Celotex*, 477 U.S. at 324).

To be sure, the court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). Yet it need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). Simply put, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Id.* If it cannot, then the court must grant summary judgment. *Little*, 37 F.3d at 1076.

Obondi did not respond to UT Southwestern's Motion. Obondi's lack of a response means that she has not designated specific facts showing there is a genuine issue for trial, and is therefore relegated to her unsworn pleadings, which are not summary judgment evidence. *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)). Thus, while Obondi's failure to respond does not permit the Court to enter a "default" summary judgment, the Court is allowed to accept the evidence presented by UT Southwestern as undisputed. *Eversley v. Mbank Dall.*, 843 F.2d 172, 174 (5th Cir. 1988); *see also id.* ("Under the usual jurisprudence, [plaintiff's] failure to respond does not permit the court to enter a 'default' summary judgment. The court would be permitted, however, to accept defendants' evidence as undisputed.").

On that basis, the Court accepts UT Southwestern's evidentiary assertions as undisputed. *See UNUM Life Ins. Co. of Am. v. Long*, 227 F. Supp. 2d 609, 614 (N.D. Tex. 2002) ("Although the court may not enter a 'default' summary judgment, it may accept evidence submitted by [the movant] as undisputed."). That acceptance alone, however, does not satisfy UT Southwestern's burden under Rule 56: UT Southwestern still must demonstrate a prima facie showing of entitlement to prevail on the claims at issue here. *See Denmark v. Cole*, No. 2:02-cv-0295, 2005 WL 3293988, at *3 (N.D. Tex. Nov. 30, 2005) (When a plaintiff fails to respond, "the Court is permitted to accept the defendants' evidence as undisputed and may grant summary judgment to the defendants upon a prima facie showing of entitlement."); *see also Morgan v. Fed. Express Corp.*, 114 F. Supp. 3d 434, 437 (S.D. Tex. 2015) ("In the context of a summary judgment, a *pro se* plaintiff's failure to file a timely response . . . alone will not support a default judgment; the movant must still show there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law.").

Finally, the Court notes that Obondi's counsel withdrew in July 2016. *See* Doc. 20, Order. She is therefore proceeding in this case *pro se*. *Id.* Her *pro se* status, however, "does not *ipso facto* satisfy her obligation to set forth specific facts supporting her claims." *Wilson v. Paulson*, No. 3:06-cv-0586-M, 2007 WL 963967, at *3 (N.D Tex. Mar. 28, 2007). Obondi bears the burden of proof at trial. And "as the summary judgment non-movant, she must show that genuine issues of material fact preclude summary judgment" by "'identify[ing] specific evidence in the record[] and articulat[ing] the precise manner in which that evidence supports her claim.'" *Id.* (quoting *Bookman*, 945 F. Supp. at 1004). Said differently, Obondi's *pro se* status does not excuse her failure to respond to UT Southwestern's Motion for Summary Judgment. "In the absence of proof, a court will not conclude that the nonmoving party could prove the required facts." *Id.* (citing *Lynch Props., Inc. v. Potomac Ins.*, 140 F.3d 622, 625 (5th Cir. 1998)).

B.      *The McDonnell Douglas Burden Shifting Framework*

As referenced, Obondi has asserted claims for discrimination, retaliation, and hostile environment under Title VII. The Court employs the *McDonnell Douglas* burden shifting framework to analyze all of those claims. *See Dick v. J.B. Hunt Transp., Inc.*, 772 F. Supp. 2d 806, 815–16 (N.D. Tex. 2011) (applying *McDonnell Douglas* framework to Title VII discrimination and retaliation claims); *Woodberry v. City of Wichita Falls*, No. 7:06-cv-206-O-KA, 2008 WL 5231872, at *7 (N.D. Tex. Dec. 10, 2008) (same for Title VII discrimination, retaliation, and hostile workplace claims).

Title VII prohibits employers from discriminating against employees because of national origin. *See* 42 U.S.C. § 2000e-2(a). Should discrimination occur, "Title VII affords employees the option of proving a violation through either direct or circumstantial evidence." *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010). "Direct evidence is evidence which, if believed, would prove the

existence of unlawful discrimination or retaliation without any inferences or presumptions." *Harry*, 2016 WL 67769, at *5. Obondi relies on circumstantial evidence.[10] For that reason, the Court analyzes her claims "under the three-step, burden-shifting analysis embodied in the 'modified *McDonnell Douglas* approach.'" *Jackson*, 619 F.3d at 466 (quoting *Burrell*, 482 F.3d at 411).

First, the plaintiff must "prove a prima facie case of discrimination by a preponderance of the evidence." *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir. 1996). Second, if the plaintiff shows a prima facie case, then "the 'burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action.'" *Jackson*, 619 F.3d at 466 (quoting *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011)). "This is a burden of production, not persuasion, on the employer's part, and it 'can involve no credibility assessment.'" *Bender v. Shulkin*, No. 3:14-cv-2595-L, 2017 WL 1156327, at *6 (N.D. Tex. Mar. 23, 2017) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Third, "[i]f the employer meets its burden, then the burden shifts back to the plaintiff to make an ultimate showing of intentional discrimination." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012).

## III.

### ANALYSIS

As referenced, only Obondi's Title VII claims for disparate treatment on the basis of national origin, pay disparity, hostile work environment, and retaliation remain. The Court addresses each in turn.

---

[10]Obondi neither indicates within her Complaint that she relies on direct evidence nor attaches any such evidence thereto. She also failed to respond to UT Southwestern's Motion for Summary Judgment or otherwise provide evidence in support of her claims. Thus, Obondi has failed to produce any direct evidence of discrimination "and the *McDonnell Douglas* framework applies." *Wilson*, 2007 WL 963967, at *3 n.3.

A.    *Disparate Treatment on the Basis of National Origin*

Obondi first alleges that she was treated differently because her national origin is Kenyan. Doc. 1, Compl. ¶¶ 21–23, 41–48, 57–63.

To establish a prima facie case for disparate treatment on the basis of national origin, Obondi must put on evidence demonstrating that she: (1) "is a member of a protected class"; (2) "was qualified for the position at issue"; (3) "was the subject of an adverse employment action"; and (4) "was treated less favorably because of [her] membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Abila v. Amec Foster Wheeler USA Corp.*, 216 F. Supp. 3d 778, 784 (S.D. Tex. 2016) (citing *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). "[A]dverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014).

Obondi is Kenyan and claims that she is qualified for her job. Doc. 1, Compl. ¶¶ 60–61. She further alleges that UT Southwestern treated her differently from her other non-Kenyan co-workers in the following ways: (1) demoting her from a team leader position to a regular technologist position; (2) assigning her tasks that she is not qualified to perform and which should have been assigned to different technologists; (3) routinely talking in a harsh, hostile manner towards her not used towards other employees in the Unit; (4) giving her lower raises than her non-Kenyan counterparts; (5) not paying her the same as her non-Kenyan counterparts; and (6) continuously making demeaning remarks, ridiculing statements, negative comments, and negative innuendos towards her. Doc. 1, Compl. ¶¶ 23, 45–47, 59–62.

UT Southwestern acquiesces that Obondi belongs to a protected class and is qualified for her

job. *See* Doc. 27, Def.'s Br. 3. But it denies that she was the victim of any adverse employment action or treated less favorably. *Id.* To that end, UT Southwestern contests each of Obondi's six above allegations, arguing that in each instance she fails to state a prima facie case of discrimination. *Id.* And even if she were to state a prima facie case, UT Southwestern goes on, she put on no evidence to rebut UT Southwestern's legitimate non-discriminatory reasons for its action. The Court considers each alleged instance of discrimination in turn, first considering whether each instance qualifies as an adverse employment action and then, if necessary, addressing whether Obondi was treated less favorably than her similarly situated non-Kenyan co-workers. *See Abila*, 216 F. Supp. 3d at 784.

1.    Demotion From Team Leader Position

Obondi first alleges that she was demoted from her team leader position to a regular technologist position. Doc. 1, Compl. ¶¶ 23, 46. That, to be sure, might normally qualify as an adverse employment action. *See Thompson*, 764 F.3d at 503–04. UT Southwestern argues two points as to why it should not be considered so here. Doc. 27, Def.'s Resp. 3–5.

First, UT Southwestern argues that Obondi's claim on this point is time-barred. *Id.* at 4.[11] Title VII provides that an unlawful employment practice shall be filed with the EEOC "within *one hundred and eighty days* after the alleged unlawful employment practice occurred . . . [or] within *three hundred days* after" if "the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings

---

[11]UT Southwestern asserted this same argument when it moved to dismiss Obondi's claims. *See* Doc. 16, Mem. Op. & Order. 6–8. The Court concluded that while Obondi's claims were likely time-barred, it was inappropriate to dismiss them at that stage in the proceedings because dismissal "would force the Court to consider materials outside the pleadings, which is not appropriate in a Rule 12(b)(6) analysis." *Id.* at 8. The Court is not so limited here, however, because Obondi's unsworn pleadings "do not constitute summary judgment evidence." *Bookman*, 945 F. Supp. at 1002.

with respect thereto upon receiving notice thereof." 42 U.S.C. § 2000e-5(e) (emphasis added); *see also Mennor v. Fort Hood Nat'l Bank*, 829 F.2d 553, 554 (5th Cir. 1987).

Texas is a "deferral state,"[12] so the second 300-day period applies. *See James v. Sears Hold. Corp.*, No. 3:13-cv-2439-G-BH, 2014 WL 1254111, at *2 (N.D. Tex. Mar. 26, 2014) ("In a 'deferral state' like Texas, the charge must be filed within 300 days of the alleged unlawful act."). Thus, Obondi must have filed her EEOC charge within 300 days of the alleged demotion. *Id.* Put differently, Obondi's Title VII claims are limited to conduct that occurred in the 300 days preceding the date on which she filed her EEOC charge.

A demotion is a discrete action and therefore "may not be pursued outside the relevant limitations period." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 280 (5th Cir. 2004).[13] In other words, Obondi had 300 days from the date of the alleged demotion to file her EEOC charge. She filed her EEOC charge on February 13, 2014. Doc. 1, Compl. ¶ 36.

Obondi, by her own admission, was demoted on October 10, 2012—some 491 days before she filed her EEOC charge. *See* Doc. 27, Def.'s Br. 5 (citing Doc. 28, Def.'s App. Supp. Def.'s Mot. Summ. J. 29 [hereinafter Def.'s App.], Obondi Dep.). So her claims arising from the alleged demotion in October 2012 are time-barred and fail as a matter of law. *See James*, 2014 WL 1254111, at *2. The Court therefore concludes that Obondi's demotion cannot constitute an adverse

---

[12]Texas is a "deferral state," meaning that it has a "State or local agency with authority to grant or seek relief from [discriminatory] practice[s] or to institute criminal proceedings with respect thereto upon receiving notice thereof." *See* 42 U.S.C. § 2000e-5(e)(1); *Conaway v. Ctrl. Data Corp.*, 955 F.2d 358, 362 n.3 (5th Cir. 1992); *see also* Doc. 16, Mem. Op. & Order 6 n.10.

[13]The Court notes that at the motion to dismiss stage, Obondi asserted that her demotion was part of an ongoing course of conduct by UT Southwestern that lasted for a number of years. Doc. 16, Mem. Op. & Order 7. The Court rejected that argument because, as stated above, a demotion is a discrete rather than ongoing action. *Id.* The Court concludes likewise here on the same basis. *See id.* at 6–8.

employment action for the purposes of her claims here.

Yet even were the Court to overlook timeliness, UT Southwestern's second point still demonstrates that Obondi has failed to allege a prima facie case. UT Southwestern claims that Obondi was not demoted; rather, she "voluntarily relinquished" her position as team leader. Doc. 27, Def.'s Br. 3–4 (citing Doc. 28, Def.'s App. 29–31). In support of that claim, UT Southwestern points to Obondi's own deposition testimony, which states, in pertinent part:

> Q.    Did you tell Ms. Rupe that you no longer wanted this position if you didn't have additional support; yes or no?
>
> A.    I know I emailed her that if the things –
>
> Q.    So I asked you a yes-or-no question.
>
> A.    Yes.
>
> Q.    Okay. You did tell her that?
>
> A.    Yes.

Doc. 28, Def.'s App. 31, Obondi Dep.. UT Southwestern goes on to say that its own internal processes require several steps before a demotion can be approved, none of which are present here. Doc. 27, Def.'s Br. 4 (citing Doc. 28, Def.'s App. 82–85, Garrett Affidavit).

The Court agrees with UT Southwestern. An employee's voluntary transfer to a lower position does not qualify as an adverse employment action absent some further proof of work conditions so intolerable as to constitute constructive demotion. *See Buie v. Berrien*, 85 F. Supp. 3d 161, 179 (D.D.C. 2015); *see also Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209, 216 n.13 (5th Cir. 2000). And Obondi has not provided any such proof.

In sum, the Court concludes that claims arising from Obondi's alleged demotion are time-

barred. But even if they were not, they would still fall short of a prima facie claim for disparate treatment on the basis national origin because Obondi voluntarily relinquished her position and therefore suffered no adverse employment action. Accordingly, the Court rejects her first disparate treatment argument.

   2.   Assignment to Tasks Above Qualification Level

Obondi next alleges that she is frequently assigned tasks for which she is not qualified and which should be assigned to different technologists. Doc. 1, Compl. ¶¶ 23, 45, 62. UT Southwestern again counters with two points.

First, UT Southwestern claims that assignment to onerous tasks does not qualify as an adverse employment action. Doc. 27, Def.'s Br. 6. The cases addressing task assignment "make clear that imposing a higher workload on an employee than on [her] coworkers is not an ultimate employment decision" and therefore cannot qualify as an adverse employment action. *Leach v. Baylor Coll. of Med.*, No. H-07-0921, 2009 WL 385450, at *19 (S.D. Tex. Feb. 17, 2009) (collecting cases). A "higher workload" generally means harder or additional tasks, not tasks for which an individual is unqualified. *See id.* That said, an employee's allegation that her employer attempted "to place her in jobs for which she [is] unqualified" is, without some additional evidentiary submission, insufficient to demonstrate an adverse employment action. *See Arnold v. Tuskegee Univ.*, No. 3:03cv-515-F, 2006 WL 47507, at *13 n.11 (M.D. Ala. Jan. 9, 2006).[14]

---

[14]The Court notes that *Arnold* involved slightly different circumstances. There, the court considered whether placement into jobs for which an employee was unqualified constituted an adverse employment action in the context of a retaliation claim rather than a disparate treatment claim. *See Arnold*, 2006 WL 47507, at *12–14. That said, the distinction makes no difference here because the standard for an act to qualify as an "adverse employment action" in the retaliation context is less onerous than that for discrimination. *See Dick*, 772 F.3d at 818–22. So if Obondi's showing is insufficient to meet the lower bar for retaliation claims, then it necessarily falls short of the higher "ultimate employment decision" bar she needed

Here, Obondi generally alleges that UT Southwestern "routinely assigned [her] tasks that she is not qualified to perform and which should have been assigned to different technologists" without referencing any specific instance or offering evidence in support. Doc. 1, Compl. ¶ 23. The Court therefore concludes that Obondi's allegations of assignment to tasks for which she is unqualified do not constitute "actionable adverse employment actions" under Title VII. *See Leach*, 2009 WL 385450, at *19.

Given that conclusion, the Court need not address UT Southwestern's second point, which seeks to rebut a specific alleged improper task assignment. *See* Doc. 27, Def.'s Br. 5–6.[15] At bottom,

_____

to meet here. *Thompson*, 764 F.3d at 503.

[15]The Court nonetheless finds it unpersuasive. UT Southwestern identifies a single instance in which Obondi "complained about not feeling comfortable operating ablation equipment." Doc. 27, Def.'s Br. 6. UT Southwestern says that it promptly corrected the issue by explaining to Obondi that she was never meant to operate the ablation equipment, just to monitor it "under the guidance of the treating physician and other technicians." *Id.* (citing Doc. 28, Def.'s App. 102–03, Garrett Affidavit). UT Southwestern goes on to claim that Obondi agrees with this story, citing to her deposition testimony in support. *Id.* (citing Doc. 28, Def.'s App. 32–33, Obondi Dep.). But the same deposition testimony contains the following excerpt:

> Q.    So let's move on to number 2 where it says – the allegation is that you were routinely assigned tasks that you were not qualified to perform and which should have been assigned to different technologists; is that correct?
> A.    Correct.
> Q.    And you believe that's a true statement?
> A.    That is true.
> Q.    So when you talk about that statement, is that dealing with what you believe to be a request that you operate the ablation equipment?
> A.    *Not only that.*

Doc. 28, Def.'s App. 31, Obondi Dep. (emphasis added).

Thus, the ablation equipment instance wasn't the only task assignment that Obondi believed to be improper and apparently intended her general allegations to entail. *See id.* Said differently, if Obondi had stated a prima facie disparate treatment case, then UT Southwestern might not have met its burden to show a legitimate nondiscriminatory reason for its behavior because: (1) Obondi complained of multiple task assignments; and (2) UT Southwestern's proffered evidence explains just one related to ablation equipment. Again, however, the Court need not proceed to this second step in the *McDonnell Douglas* framework because Obondi failed to state a prima facie case. *See Leach*, 2009 WL 385450, at *18–19.

- 15 -

Obondi "has not made the necessary showing of an adverse employment action." *Leach*, 2009 WL 385450, at *18. And as a result, her task assignment allegations do not constitute a prima facie case of disparate treatment. *See id.* at 18–19. For that reason, the Court rejects Obondi's second argument as to disparate treatment.

### 3. Talking in Harsh, Hostile Manner

Obondi claims that she is routinely talked to in a harsh, hostile manner not used towards other employees in her unit. Doc. 1, Compl. ¶¶ 23, 45, 62. UT Southwestern responds that the occasional use of harsh words doesn't qualify as an adverse employment action. Doc. 27, Def.'s Br. 7 (citing Doc. 28, Def.'s App. 1, Obondi Discrim. Charge ¶ 7). The Court agrees with UT Southwestern.

"For an action to be considered 'adverse' it must go beyond 'petty slights, minor annoyances, and simple lack of good manners.'" *Puleo v. Texana MHMR Ctr.*, 187 F. Supp. 3d 769, 781–82 (S.D. Tex. 2016) (quoting *Butler v. Exxon Mobil Corp.*, 838 F. Supp. 2d 473, 495–96 (M.D. La. 2012)). So "allegations of unwarranted complaints about the quality of the plaintiff's work and unnecessary job scrutiny and criticisms are not considered adverse employment actions." *Id.*

Obondi's deposition testimony, cited to by UT Southwestern, suggests that Rupe—Obondi's supervisor and the focus of her allegations (*see* Doc. 1, Compl. ¶ 23)—never used offensive language against Obondi. Doc. 28, Def.'s App. 53–54, Obondi Dep.; *see also* Doc. 27, Def.'s Br. 7, 7 n.5. Nor did she curse at Obondi or touch her. *Id.* at 53–55, Obondi Dep. The harsh talk or treatment complained of included things such as saying "go, go, go" when Obondi was needed to help a patient and telling Obondi that she could not go to the restroom because she needed to stay with a patient despite the presence of other care-givers. Doc. 28, Def.'s App. 46–48, Obondi Dep.; *see also* Doc. 27,

Def.'s Br. 7 n.5. In other words, Obondi suffered workplace criticisms and job scrutiny, not national original discrimination. *See Puleo*, 187 F. Supp. 3d at 781–82.

Indeed, Obondi's only mention of national origin in reference to Rupe's supposed harsh talk involves an instance in which Rupe allegedly yelled at Obondi for referring to herself as a " beautiful Kenyan" to a patient. Doc. 28, Def.'s App. 48–51, 54–55, Obondi Dep. But allegedly chastising Obondi for calling herself a "beautiful Kenyan"—a claim which Obondi does not refute in her deposition—is not the same as actively referring to Obondi's national origin; rather, it is a criticism of her alleged workplace behavior. *See Butler*, 838 F. Supp. 2d at 496 (explaining that "as a matter of law, [a p]laintiff's allegations of workplace criticism and job scrutiny are not adverse employment actions").[16] Obondi's own deposition testimony goes on to clarify that, apart from the above incident, Rupe never used offensive language based on race or national origin towards her. Doc. 28, Def.'s App. 54, Obondi Dep.

On that basis, the Court concludes that Obondi's allegations of harsh, hostile talk are not adverse employment actions. *See Butler*, 838 F. Supp. 2d at 496. Accordingly, the Court rejects Obondi's third disparate treatment theory. *See Puleo*, 187 F. Supp. 3d at 781–82.

4.    Lower Raises

Obondi's fourth allegation of disparate treatment is that she received lower raises than her non-Kenyan counterparts. Doc. 1, Compl. ¶¶ 23, 45, 62. In this instance, UT Southwestern does not contest Obondi's prima facie case but offers evidence to demonstrate that its actions were nondiscriminatory. *See* Doc. 27, Def.'s Br. 7–8. The Court therefore assumes without deciding that

---

[16]*Butler*, like *Arnold* (*see supra* note 14), addresses adverse employment actions in the context of a retaliation claim. *See* 838 F. Supp. 2d. at 781–82. And as above, Obondi's failure to meet the retaliation standard's lower bar necessarily means that she failed to meet the higher bar for disparate treatment.

Obondi has stated a prima facie case on this point, and considers whether UT Southwestern has proffered evidence sufficient to show a legitimate, nondiscriminatory reason for Obondi's lower raises. *See Jackson*, 619 F.3d at 466.

UT Southwestern claims that its "process of determining classified employee information is led by the Compensation Division of the Office of Human Resources." Doc. 27, Def.'s Br. 7 (citing Doc. 28, Def.'s App. 4, Capron-Reid Decl. ¶ 3; 11–14, Ovens Decl. ¶¶ 3–15). The Compensation Division aims to "create an environment where management can attract and retain the caliber of employees necessary to accomplish the goals and objectives of their organizations," and to that end, develops "salary structure and pay and performance programs that are market competitive and support [UT Southwestern's] long range vision." *Id.* at 7–8 (citing Doc. 28, Def.'s App. 11–14, Ovens Decl. ¶¶ 3–15). UT Southwestern maintains that while management has some input into compensation decisions for certain positions, the Compensation Division has the final say on job title, grade, job description, and salary range for every position. *Id.* at 8 (citing Doc. 28, Def.'s App. 11–14, Ovens Decl. ¶¶ 3–15). And perhaps most relevant here, the "Compensation division is also involved in decisions regarding pay increases." *Id.*

There are, according to UT Southwestern, two primary processes through which hospital employees might obtain a pay increase: merit raises and market adjustments. *Id.* Merit raises, as expected, amend pay on a merit system determined by an employee's demonstrated performance. *Id.* Market adjustments, by contrast, are made to keep salaries competitive with those of other employers in the market. *Id.* UT Southwestern claims that all employment decisions, including compensation decisions, "are made without regard to national origin, race, color, national origin [sic], religion, sex, age, protected veteran status, citizenship status, or disability." *Id.* (citing Doc. 28, Def.'s App. 5,

Capron-Reid Decl. ¶ 6; 12, Ovens Decl. ¶ 6).

With that in mind, UT Southwestern says that its decisions on Obondi's pay increases conformed with UT Southwestern's policy and did not consider Obondi's national origin. *Id.* (citing Doc. 28, Def.'s App. 13–14, Ovens Decl. ¶ 15). In support of that statement, UT Southwestern offers the declarations of Carolanne Capron-Reid, UT Southwestern's Director of Nursing Operations, and Jim Ovens, UT Southwestern's Director of Compensation & Performance Management. *See id.* (citing Doc. 28, Def.'s App. 4–6, Capron-Reid Decl. ¶¶ 3–15; 11–14, Ovens Decl. ¶¶ 3–15). Each declaration explains at length UT Southwestern's procedures for employee pay increases. Doc. 28, Def.'s App. 4–6, Capron-Reid Decl. ¶¶ 3–15; 11–14, Ovens Decl. ¶¶ 3–15. And Ovens's declaration plainly states that UT Southwestern "did not take into consideration . . . Obondi's national origin" when rendering pay increase decisions. Doc. 28, Def.'s App. 14, Ovens Decl. ¶ 15. The Court therefore concludes that UT Southwestern has satisfied its burden of producing a legitimate, nondiscriminatory reason for its conduct regarding Obondi's pay increases. *See Bender*, 2017 WL 1156327, at *6 (explaining that employer's burden is one "of production, not persuasion").

So Obondi now bears the ultimate burden to produce evidence showing intentional discrimination. *Reed*, 701 F.3d at 439. But as referenced, Obondi failed to respond to UT Southwestern's Motion for Summary Judgment or otherwise make an offer of proof in support of her allegations. Thus, she relies solely on her unsworn pleadings, which are not summary judgment evidence. *Bookman*, 945 F. Supp. at 1002. And as a result, she fails to carry her ultimate burden under the *McDonnell Douglas* framework on this point. *See Reed*, 701 F.3d at 439.

### 5.   Different Pay

Obondi next alleges that UT Southwestern paid her at a disparate rate from her non-Kenyan

co-workers in violation of Title VII. Doc. 1, Compl. ¶ 23. While this allegation could be addressed here, Obondi has asserted a standalone claim for pay disparity under Title VII. *Id.* ¶¶ 49–56. So the Court conducts its analysis below in addressing that claim. *See infra* Section III.B. To the extent Obondi asserts pay disparity as a separate theory under her disparate treatment claim, the Court rejects it here for the same reasons expressed below.

6.  Demeaning Remarks, Ridiculing Statements, and Negative Comments and Innuendos

Obondi's final disparate treatment allegation is that Rupe continuously ridicules her and makes demeaning remarks and negative comments and innuendos towards her. Doc. 1, Compl. ¶¶ 23, 45, 62. UT Southwestern counters that these actions—just like the harsh talk and work criticism above—don't rise to the level of adverse employment actions. Doc. 27, Def.'s Br. 8–9. The Court disagrees with UT Southwestern but still concludes that Obondi has failed to sufficiently prove that an adverse employment action occurred.

To start—and contrary to UT Southwestern's position—the demeaning remarks, ridiculing statements, and negative innuendos at issue here are distinct from the "'petty slights, minor annoyances, and simple lack of good manners that the Supreme Court has recognized are not actionable'" adverse employment actions. *See Butler*, 838 F. Supp. 2d at 496 (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009)). For example, Obondi alleges that Rupe, along with other UT Southwestern managers and supervisors, actively sought to paint a demeaning picture of employees with Kenyan national origin as, among other things, liars, troublemakers, and bad employees before ever knowing anything about the person. Doc. 1, Compl. ¶ 74. Typecasting employees with Kenyan national origin as liars and troublemakers is distinct from the job scrutiny

and criticisms addressed above. *Cf. Puleo*, 187 F. Supp. 3d at 781–82 ("Accordingly, allegations of unwarranted complaints about the quality of the plaintiff's work and unnecessary job scrutiny and criticisms are not considered adverse employment actions."). So if the Court were to take Obondi's allegations as true, then the presence of an adverse employment action *might* be a close call.

But the Court does not take Obondi's allegations as true; rather, she must prove her initial prima facie case by a preponderance of the evidence. *LaPierre*, 86 F.3d at 448. As addressed above, however, Obondi relies only on her unsworn pleadings, which are not summary judgment evidence. *Bookman*, 945 F. Supp. at 1002. Indeed, the only evidence here has been put on by UT Southwestern.

And that evidence, including Obondi's deposition testimony referenced above—for example, those excerpts admitting that, aside from an incident in which Rupe allegedly chastised Obondi for referencing her own national origin, Rupe never used offensive language with Obondi, cursed at her, or *mentioned her race or national origin* (*see* Doc. 28, Def.'s App. 46–55, Obondi Dep.)—flies in the face of Obondi's allegations. Simply put, Obondi has not shown by a preponderance of the evidence that her allegations are true. *See LaPierre*, 86 F.3d at 448. The Court therefore finds that Obondi has failed to offer competent summary judgment evidence on this point sufficient to state a prima facie case of disparate treatment on the basis of national origin. *See Talamantez v. Correct. Corp. of Am.*, 202 F. Supp. 2d 546, 553 (N.D. Tex. 2002) (finding plaintiff failed to state a prima facie case of disparate treatment on the basis of national origin because he failed to support his claims with competent summary judgment evidence).

At bottom, Obondi failed to satisfy her burden under the *McDonnell Douglas* framework with respect to each of her allegations of disparate treatment. *See Abila*, 216 F. Supp. 3d at 783–85; *see*

*also LaPierre*, 86 F.3d at 448. For that reason, the Court concludes that UT Southwestern is entitled to summary judgment on Obondi's Title VII disparate treatment claim.

B.    *Pay Disparity*

The Court next addresses Obondi's Title VII pay disparity claim. Obondi alleges that UT Southwestern paid her at a disparate rate from her non-Kenyan co-workers. Doc. 1, Compl. ¶¶ 23, 49–56. Specifically, Obondi claims that of 11 RCIS lab techs, she was: (1) the only person of Kenyan national origin; and (2) the lowest paid despite having the "largest amount of employment responsibilties." *Id.* ¶¶ 22, 55. Obondi's Discrimination Charge zeroes in on one RCIS, Jennifer Holly,[17] in particular, alleging that due to UT Southwestern's "unequal, discriminatory treatment," she was "paid approximately $10,000.00 more per year" despite having less training. Doc. 28, Def.'s Br. 1, Obondi Discrim. Charge. ¶ 7. UT Southwestern disagrees, countering that Obondi has failed to prove a prima facie pay disparity case, and that even if she has the basis of such disparity was legitimate and nondiscriminatory. Doc. 27, Def.'s Br. 15–18.

To establish a prima facie case of pay disparity under Title VII, an employee "must show that [she] was a member of a protected class and that [she] was paid less than a non-member for work requiring substantially the same responsibility." *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008). Put another way, an employee must show that her "circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class." *Id.* at 523. UT Southwestern disputes that Obondi has made a showing sufficient to meet that standard. *See*

---

[17]Obondi's Discrimination Charge does not mention Holly by name, but complains of "another Registered Cardiovascular Invasive Specialist" who is unfairly paid more than Obondi. Doc. 28, Def.'s App. 1, Obondi Discrim. Charge ¶ 8. Obondi later clarified through deposition testimony that the RCIS in question is Jennifer Holly. *Id.* at 63, Obondi Dep.

Doc. 27, Def.'s Br. 16. That analysis, however, is unnecessary because UT Southwestern has produced a nondiscriminatory rationale for its conduct sufficient to defeat any presumption of discrimination that Obondi's pleadings might have raised, yet Obondi has offered no evidence in reply. So to address the larger point, the Court assumes without deciding that Obondi has made a prima facie showing of pay disparity.

UT Southwestern offers extensive evidence of its compensation determination process to demonstrate its nondiscriminatory rationale. *See* Doc. 27, Def.'s Br. 16–18. To start, UT Southwestern does not contest that Holly, who has since changed jobs, earned more than Obondi at the time she left. Doc. 27, Def.'s Br. 17. As mentioned above, UT Southwestern's Compensation Division drives compensation decisions. Compensation for an RCIS in the Cardiovascular Interventional Radiology Unit such as Obondi is driven by a number of factors, including: (1) required education; (2) training; (3) work experience and other qualifications for the position; (4) supervisory responsibility; (5) length of UT System or UT Southwestern employment service; and (6) nature of the working environment. *Id.* at 16 (citing Doc. 28, Def.'s App. 4–6, Capron-Reid Decl. ¶¶ 3–15; 11–14, Ovens Decl. ¶¶ 3–15).

And as UT Southwestern points out, applying those factors here suggests that Holly merited higher pay than Obondi. To the best of UT Southwestern's knowledge,[18] Holly, who received both a bachelors and a masters degree while employed at UT Southwestern, had more education, training, and qualifications. *Id.* at 17 (citing Doc. 28, Def.'s Br. 6, Capron-Reid Decl. ¶¶ 12–15). She also held a supervisory role as Chief CV/IR Technician during the period in which Obondi asserts she was

___

[18]UT Southwestern claims that "Obondi did not inform [it] that she completed any additional degrees during the term of her employment." Doc. 27, Def.'s Br. 18.

unfairly paid more. *Id.* at 18 (citing Doc. 28, Def.'s Br. 6, Capron-Reid Decl. ¶¶ 12–15). What's more, Holly started working at UT Southwestern a year before Obondi and received equal or greater performance ratings than Obondi during the period in which they both worked at UT Southwestern. *Id.* at 17 (citing Doc. 28, Def.'s Br. 6, Capron-Reid Decl. ¶¶ 12–15). UT Southwestern goes on to reemphasize its earlier claim that all employment decisions, including "compensation decisions, are made without regard to race, color, national origin, religion, sex, age, protected veteran status, citizenship status, or disability." *Id.* at 18 (citing Doc. 28, Def.'s App. 4–6, Capron-Reid Decl. ¶¶ 3–15; 11–17, Ovens Decl. ¶¶ 3–15).

The Court concludes that UT Southwestern's offerings satisfy its burden of producing a legitimate, nondiscriminatory reason for its conduct regarding Obondi's pay. *See Bender*, 2017 WL 1156327, at *6 (explaining that employer's burden is one "of production, not persuasion"). As referenced, Obondi has failed to respond or otherwise demonstrate that UT Southwestern's proffered rationale is mere pretext or that her national origin was a motivating factor in her pay disparity, so her claim for pay disparity must fail. *See Grey v. Dall. Ind. Sch. Dist.*, No. 3:04-cv-1164-K, 2005 WL 3577461, at *3 (N.D. Tex. Dec. 30, 2005). For that reason, UT Southwestern is entitled to summary Judgment as to Obondi's Title VII pay disparity claim. *Id.*

C.   *Retaliation*

The Court now turns to Obondi's Title VII retaliation claim. Title VII makes it unlawful for an employer to retaliate against an employee for opposing any unlawful discrimination practice. *See* 42 U.S.C. § 2000e-3. To set out a prima facie case of retaliation, Obondi must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. *Gee v. Principi*, 289 F.3d

342, 345 (5th Cir. 2002).

A plaintiff engages in a "protected activity" when she has either: (1) "'opposed any practice made an unlawful employment practice by [Title VII]'"; or (2) "'made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under [Title VII].'" *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) (quoting 42 U.S.C. § 2000e-3(a)). To show that she opposed an unlawful employment practice, a plaintiff must demonstrate that she had a "reasonable belief that the employer was engaged in unlawful employment practices." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007).

The term "adverse employment action" is interpreted differently in the context of retaliation claims than in the context of discrimination claims. *See supra* note 14. Here, it means any action a reasonable employee would find materially adverse so as to discourage the making or supporting of a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *King v. Louisiana*, 294 F. App'x 77, 84 (5th Cir. 2008). And "[c]lose timing between an employee's protected activity and an adverse employment action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).

UT Southwestern claims that Obondi has failed to establish a prima facie case because she did not engage in a protected activity and, even if she did, suffered no adverse employment action as a result. Doc. 27, Def.'s Br. 10–15. The Court addresses each point in turn.

1.    Protected Activity

Obondi's Discrimination Charge alleges numerous times that Obondi complained of "Rupe's discriminatory behavior" to UT Southwestern. Doc. 28, Def.'s App. 1–3, Obondi Discrim. Charge.

As does her Complaint. Doc. 1, Compl. ¶¶ 14, 27–28, 31–33, 35, 52, 54, 70, 118. Despite those allegations, UT Southwestern maintains, Obondi identifies just two specific instances in which she complained internally about her treatment. Doc. 27, Def.'s Br. 10 (citing Doc. 28, Def.'s App. 2, Obondi Discrim. Charge). Put another way, UT Southwestern argues that Obondi's retaliation claim is based solely on internal complaints. Those complaints, UT Southwestern stresses, never mentioned national origin discrimination; rather, they just complained generally about discrimination and Obondi's treatment. *Id.* at 11 (citing Doc. 28, Def.'s App. 68–70, 70–77, Obondi Dep.).

A review of the pleadings and record in this case indicates that UT Southwestern is correct: While Obondi continually references complaining to UT Southwestern about her treatment, she only ever identifies two events. *See* Doc. 1, Compl. ¶¶ 14, 27–28, 31–33, 35, 52, 54, 70, 118; Doc. 28, Def.'s App. 1–3, Obondi Discrim. Charge. The first was on September 4, 2013, when Obondi met with Rupe's supervisor and UT Southwestern's HR department. Doc. 1, Compl. ¶ 28; Doc. 28, Def.'s App. 2, Obondi Discrim. Charge ¶ 11. The second was on November 18, 2013, when Obondi complained to UT Southwestern's EAP. Doc. 1, Compl. ¶¶ 28; Doc. 28, Def.'s App. 2, Obondi Discrim. Charge ¶ 11. And in neither instance did Obondi—by her own admission—mention or complain of national origin discrimination. Doc. 28, Def.'s Br. 68–70, 72–75, 77, Obondi Dep. Indeed, Obondi's first explicit reference to national origin discrimination was in her Discrimination Charge filed on February 13, 2014. *Id.* at 75, Obondi Dep.

The Fifth Circuit has made plain that "'a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute a protected activity.'" *Paske v. Fitzgerald*, 785 F.3d 977, 986 (5th Cir. 2015) (quoting *Davis v. Dall. Ind. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011)). As a result, internal complaints of discrimination or harassment in general are

insufficient; an employee must instead protest a specific form of discrimination unlawful under Title VII. *Id.*; *see also Davis*, 448 F. App'x at 493. Thus, Obondi did not engage in a protected activity until she filed her Discrimination Charge with the EEOC.[19]

UT Southwestern seems to assert that this conclusion should dispose of Obondi's retaliation claim in its entirety. Doc. 27, Def.'s Br. 10–11. The Court disagrees. Obondi alleges that UT Southwestern retaliated against her "during 2014 and through the present." Doc. 1, Compl. ¶¶ 114, 119. She filed her Discrimination Charge on February 13, 2014. While she may not recover for any allegedly retaliatory actions that took place before then, those that allegedly took place afterwards are unaffected. *Cf. Mishra v. Bank of Am.*, No. 3:14-cv-1521-M, 2016 WL 944133, at *8 (N.D. Tex. Feb. 16, 2016) (finding employee failed to state a prima facie case of retaliation when she based a claim solely on internal complaints of discrimination in general). The net impact of UT Southwestern's first argument, then, is to clarify that Obondi cannot recover for any alleged retaliatory act that occurred in the first six weeks of 2014. With that in mind, the Court turns to UT Southwestern's second point.

2.     Adverse Employment Action

"To constitute prohibited retaliation, an employment action must be 'materially adverse,' one that would 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Stewart*, 586 F.3d at 331 (quoting *Burlington N.*, 548 U.S. at 68). Obondi alleges that UT

---

[19]As UT Southwestern notes in its briefing, Obondi's use of its EAP is not a protected activity in and of itself. Doc. 27, Def.'s Br. 11 n.6. The Fifth Circuit has reached a similar conclusion, albeit under different circumstances. *See Lanier v. Univ. of Tex. SW Med. Ctr.*, 527 F. App'x 312, 317 (5th Cir. 2013) (finding use of EAP was not a protected activity in an FMLA retaliation case). Nevertheless, the same rationale applies here. Obondi's use of UT Southwestern's EAP is not a protected activity in and of itself because "the EAP is not involved with the filing or processing of" EEOC charges. *See id.*

Southwestern retaliated against her by, among other things: (1) assigning her more work than she could complete within a work day; (2) micro-managing her; (3) applying written policies to her in a discriminatory manner; (4) giving her unsubstantiated performance reviews; and (6) reprimanding her in writing. Doc. 1, Compl. ¶¶ 33–35, 111–19.[20] UT Southwestern counters that none of those activities are adverse employment actions. The Court agrees with UT Southwestern.

For starters, and as addressed above, increasing an employee's workload is not an adverse employment action. *See Ellis v. Compass Grp. USA, Inc.*, 426 F. App'x 292, 297 (5th Cir. 2011) ("Ellis admits that immediately before her suspension, she was attempting to obtain statements from coworkers to prove that Chartwells was not allowing them to assist her, that Chartwells was overworking her, and that she was being given a heavier workload than were other employees. As we stated above, none of these alleged harms is an adverse employment practice."). So Obondi's complaint that she was assigned too much work misses the mark. As does her claim that she was micro-managed. *See, e.g., Anand v. N.Y. State Dep't of Taxation & Fin.*, No. 10-cv-5142 (SJF)(WDW), 2013 WL 3874425, at *9 (E.D.N.Y. July 25, 2013) ("[C]ourts have found that reprimands, threats of disciplinary action[,] and excessive scrutiny do not constitute adverse actions in a Title VII retaliation context.") (internal citations omitted); *Ferguson v. Deptford Twp.*, No. 06-2112(RBK), 2008 WL 5401630, at *5 (D.N.J. Dec. 22, 2008) ("Allegations of intense scrutiny, overly critical supervision, unnecessary reprimands or derogatory comments do not constitute an adverse employment action.").

---

[20]As referenced, Obondi's Complaint also lists her examples of discrimination as examples of retaliation. *See supra* note 7. The Court remains unpersuaded by those allegations here for the same reasons expressed above in the context of disparate treatment and pay disparity, and for those reasons concludes that they do not constitute adverse employment actions.

The Court is similarly unmoved with regard to Obondi's complaint about a bogus "lowered performance evaluation." Doc. 1, Compl. ¶ 69. The Fifth Circuit has clarified that "a low performance evaluation alone is not an adverse employment action" in the context of retaliation claims. *Johnson v. McDonald*, 623 F. App'x 701, 704 (5th Cir. 2015) (citing *Douglas v. DynMcDermott Petroleum Ops. Co.*, 144 F.3d 364, 373 n.11 (5th Cir. 1998)). And while a "low evaluation coupled with other tangible effects (like denial of a bonus)" *might* constitute an adverse employment action, that's not the case here. *See id.*

As UT Southwestern notes in its briefing and supports with its summary judgment evidence, Obondi consistently received average to good performance reviews during her time at UT Southwestern and regularly received merit pay increases as a result. Doc. 27, Def.'s Br. 14 (citing Doc. 28, Def.'s App. 4–6, 11–17, 59–61). There were, to be sure, some pay decreases as well. But as addressed above, those are largely attributable to Obondi's voluntary relinquishment of a supervisor position. Obondi provides no evidence to the contrary. So even taking Obondi's claim of an unsubstantiated lowered performance evaluation as true, her allegations of some tangible corollary effect to go along with it are speculative at best. In other words, Obondi has failed to allege sufficient facts to demonstrate that she suffered anything other than a low evaluation, which "alone is not adverse employment action." *Johnson*, 623 F. App'x at 704.

The Court now turns to Obondi's last allegations of retaliation—unequal application of written policies and the written reprimand. Doc. 1, Compl. ¶ 114; Doc. 28, Def.'s App. 2, Obondi Discrim. Charge ¶ 21. As established above, Obondi's retaliation allegations are limited to events that occurred after the date on which she engaged in a protected activity by filing her Discrimination Charge: February 13, 2013. Both of these allegations took place before. Obondi claims that she

received a written reprimand on November 26, 2013. Doc. 1, Compl. ¶ 34. And the policy application in question—namely, that Obondi was not allowed to bring food into a lab when her non-Kenyan counterparts could—is mentioned in Obondi's Discrimination Charge (*i.e.*, it occurred before she filed the Charge). Doc. 1, Compl. ¶ 114; Doc. 28, Def.'s Br. 2, Obondi Discrim. Charge ¶ 21. So neither can constitute a retaliatory adverse employment action. *See Wheat v. Fla. Parish Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016).

"Title VII 'does not set forth a general civility code for the American workplace.'" *Stewart*, 586 F.3d at 332 (quoting *Burlington N.*, 548 U.S. at 68). And at bottom, Obondi's allegations "do not rise to the level of material adversity but instead fall into the category of 'petty slights, minor annoyances, and simple lack of good manners' that the Supreme Court has recognized are not actionable retaliatory conduct." *Id.* In short, the actions Obondi alleges UT Southwestern carried out "would not dissuade a reasonable employee from making a charge of discrimination." *Id.* On that basis, she has failed to set out a prima facie case of retaliation under Title VII. Accordingly, the Court concludes that UT Southwestern is entitled to summary judgment on this cause of action.

D.      *Hostile Work Environment*

Finally, the Court addresses Obondi's hostile work environment claim. UT Southwestern asserts that it is entitled to summary judgment here for two reasons: (1) Obondi failed to exhaust her administrative remedies and the Court therefore lacks subject matter jurisdiction; and (2) even if Obondi did exhaust her administrative remedies, she fails to prove a prima facie case of hostile work environment under Title VII. Doc. 27, Def.'s Br. 18–22. The Court addresses each argument in turn.

UT Southwestern first reasons that Obondi failed to exhaust her administrative remedies because her EEOC Discrimination Charge does not explicitly include a hostile work environment

claim. *Id.* at 18–19. Said differently, UT Southwestern argues that the scope of this suit exceeds the scope of Obondi's Discrimination Charge. *Id.*

<u>1.</u>    <u>Exhaustion of Administrative Remedies</u>

UT Southwestern is correct that to bring a hostile work environment claim under Title VII, Obondi needed to first exhaust her administrative remedies by timely filing a discrimination charge with the EEOC. *Lacher v. West*, 147 F. Supp. 2d 538, 545 (N.D. Tex. 2001). She did. As a result, the scope of this suit may extend "no further than the scope of the investigation that can reasonably be expected to grow out of the charge of discrimination." *Id.* So while this suit's scope "is not limited to the exact language of the EEOC charge," it cannot "extend beyond the investigation that would reasonably arise from that language." *Id.*

Obondi's Discrimination Charge is three pages long and alleges most every incident of disparate treatment, pay disparity, and retaliation addressed above. *See* Doc. 28, Def.'s Br. 1–3, Obondi Discrim. Charge. But as UT Southwestern notes, it does not explicitly reference a hostile work environment. Doc. 27, Def.'s Br. 19. On that basis, UT Southwestern concludes, Obondi's hostile work environment claim is beyond this suit's scope and ought to be dismissed for lack of subject matter jurisdiction. *Id.* at 19–20.

The Court disagrees. UT Southwestern relies on one of the Court's own prior decisions in which the Court found a plaintiff's EEOC charge that did not explicitly reference a hostile work environment to not encompass a Title VII hostile work environment claim. *Id.* (citing *Zavala v. Carrollton-Farmers Branch Ind. Sch. Dist.*, No. 3:15-cv-1413-B, 2015 WL 9269416, at *5). The Court continues to concur with its reasoning in *Zavala*, where it stated:

The Court agrees with the District. Even liberally construed, nothing in the EEOC

> Charge indicates that Zavala was enduring a hostile work environment. According to the charge, the discrimination lasted for just over a month, was not continuing, and consisted solely of discrete discriminatory acts (viz., failure to promote and retaliation). . . . Moreover, the relevant inquiry is not what Zavala subjectively meant in his description of the facts, but what the EEOC would reasonably have understood the content of the complaint to be and what an investigation into those events would reveal. For Zavala to prevail, the Court would have to find that allegations of failure to promote and retaliation necessarily carry with them a claim for a hostile work environment. The Court declines to so hold, and finds itself in good company. Consequently, Zavala's hostile work environment claim must be dismissed because he has failed to exhaust his administrative remedies.

*Zavala*, 2015 WL 9269416, at *5. In other words, the Court found that a discrimination charge describing a month's worth of isolated, discrete discriminatory acts didn't bring with it a claim for hostile work environment. *Id.* Here, though, a different result is warranted.

Obondi's Discrimination Charge alleged something altogether different: months and years of continual improper task assignment and offensive remarks on top of discrete discriminatory acts such as demotion and unequal pay. Doc. 28, Def.'s App. 1–2, Obondi Discrim. Charge. While the veracity and merit of those allegations is another question—and is addressed below—the Court finds it reasonable to expect that a hostile work environment claim might grow out of a charge of continuous, pervasive harassment on the basis of national origin.

To be sure, the Court still declines to hold that allegations of disparate treatment "and retaliation *necessarily* carry with them a claim for hostile work environment." *Zavala*, 2015 WL 9269416, at *5 (emphasis). But they don't necessarily preclude such a claim, either: What grows out of a charge of discrimination depends on the allegations contained within it. *See Lacher*, 147 F. Supp. 2d at 545. And here, those allegations, true or not, describe continuous harassment over a period of months and years from which a claim for hostile work environment could reasonably be expected to grow. For that reason, the Court rejects UT Southwestern's first argument.

<u>2.</u>      <u>Prima Facie Case</u>

Turning to its second, UT Southwestern contends that Obondi has failed to establish a prima facie case of hostile work environment. Doc. 27, Def.'s Br. 20–22. To make out a prima facie hostile work environment claim under Title VII, Obondi must show that she: (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on her national origin; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) UT Southwestern knew or should have known of the harassment in question and failed to take prompt remedial action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). The first element is not much at issue here: Obondi is a member of a protected group because her national origin is Kenyan.

Obondi alleges that she was subjected to the following instances of unwelcome harassment due to her national origin: (1) paying her less than her non-Kenyan counterparts; (2) demoting her;[21] (3) assigning her tasks to which she is not qualified to perform; (4) talking to her in a harsh, hostile manner, including unwelcome remarks, rumors, and innuendos; (5) assigning her more work than could be done in one day and micro-managing her; and (6) applying written policies differently towards her. Doc. 1, Compl. ¶¶ 73–74.

The Court has already determined that, "taken as true and viewed in the light most favorable to Obondi," these allegations sufficiently demonstrate a plausible hostile work environment claim.

---

[21]The Court notes that while Obondi's standalone disparate treatment claim stemming from her alleged demotion is time-barred, the alleged demotion may still be considered as background for Obondi's hostile work environment claim in weighing the totality of the circumstances. *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017). Its impact is inconsequential, however, because UT Southwestern has provided—and Obondi has not rebutted—competent evidence to show that the "demotion" was actually Obondi's own voluntary transfer to a lower position. *See supra* pp. 11–13.

Doc. 16, Mem. Op. & Order 10. As mentioned numerous times here, though, this is a different stage in the proceedings with different burdens. The Court does not take Obondi's allegations as true now; rather, she must prove her prima facie case by a preponderance of the evidence. *LaPierre*, 86 F.3d at 448. Instead, Obondi relies only on her unsworn pleadings, which are not summary judgment evidence. *Bookman*, 945 F. Supp. at 1002. Indeed, the only evidence here has been put on by UT Southwestern.

And that evidence, including Obondi's deposition testimony referenced above—for example, those excerpts admitting that, aside from an incident in which Rupe allegedly chastised Obondi for referencing her own national origin, Rupe never used offensive language with Obondi, cursed at her, or *mentioned her race or national origin* (*see* Doc. 28, Def.'s App. 46–55, Obondi Dep.)—and declarations from UT Southwestern's management team describing equitable treatment, flies in the face of Obondi's allegations. Put differently, Obondi has not shown by a preponderance of the evidence that her allegations are true. *See LaPierre*, 86 F.3d at 448.

The Court therefore finds that Obondi has failed to offer competent summary judgment evidence sufficient to establish a prima facie case of hostile work environment under Title VII. *See Walters v. BG Foods, Inc.*, No. 1:14-cv-96, 2015 WL 1926224, at *6 (E.D. Tex. Apr. 25, 2015) (finding plaintiff failed to state a prima facie case of hostile work environment under Title VII because he failed to respond to his employer's motion for summary judgment and therefore failed to support his claim with competent summary judgment evidence). Accordingly, UT Southwestern is entitled to summary judgment on that cause of action. *Id.*

IV.

CONCLUSION

Based on the foregoing, the Court **GRANTS** UT Southwestern's Motion for Summary Judgment in its entirety. And so the Court **DISMISSES with prejudice** Obondi's suit. Final Judgment will follow this Order.

**SO ORDERED.**

**SIGNED: June 23, 2017**.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE